**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

**ANNELLA JEANETTE BEARDEN**                                           **PLAINTIFF**

**V.**              **CASE NO.: 4:11CV00170 BD**

**MICHAEL J. ASTRUE, Commissioner,
Social Security Administration**                                              **DEFENDANT**

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff Annella Jeanette Bearden appeals the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claim for Disability Insurance benefits ("DIB") and Disabled Widow's Insurance benefits under Title II of the Social Security Act (the "Act"). For the following reasons, the decision of the Commissioner is AFFIRMED.

**I.**     **<u>Background</u>:**

Ms. Bearden filed for DIB on August 31, 2006, and for widow's benefits on October 2, 2006, claiming disability since April 15, 2005, due to congestive heart failure, depression, hypertensive cardiovascular disease, and high blood pressure. (Tr. 30, 77, 80, 154-56, 159-161) After denials initially and upon reconsideration, Ms. Bearden requested a hearing before an Administrative Law Judge ("ALJ").[1] (Tr. 77-82, 91-94, 96-97) The ALJ held a hearing on January 14, 2010, at which Ms. Bearden appeared with her

---

[1] The Honorable David L. Knowles.

attorney and testified. (Tr. 28-67)  The ALJ also heard testimony from a medical expert, Arthur Schmidt, M.D., a vocational expert, and a friend of Ms. Bearden's. (Tr. 45-48)

The ALJ issued a decision on December 10, 2008, finding that Ms. Bearden was not disabled for purposes of the Act. (Tr. 13-26)  On December 30, 2010, the Appeals Council denied her request for review, making the ALJ's decision the Commissioner's final decision. (Tr. 1-7)

Ms. Bearden's insured status for DIB ended on December 31, 2010, and in order for her to be entitled to disabled widow's insurance benefits, she must establish that she was disabled before June 30, 2008.[2]

At the time of the hearing before the ALJ, Ms. Bearden was 60 years old and was living with a friend. (Tr. 33, 40)  She had graduated from high school and had two years of business school. (Tr. 34)  She had past work as an administrative assistant. (Tr. 34)

Ms. Bearden smokes a pack of cigarettes a day. (Tr. 259, 279)  She also abuses alcohol. (Tr. 279, 404, 463, 494-496)  She continues to drink alcohol in spite of being advised to quit. (Tr. 36, 318, 404, 409, 496)  At the hearing, she testified that the longest she had ever been sober since April of 2005, was fifteen months. (Tr. 36)  She stated that leading up to her hearing, she had gone eight months without drinking alcohol, but "two nights ago I slipped up and drank." (Tr. 36)

---

[2] Ms. Bearden's husband died in March, 2004. (Tr. 66, 271)

**II.     Decision of the Administrative Law Judge:**

The ALJ followed the required five-step sequence to determine: (1) whether the claimant was engaged in substantial gainful activity; (2) if not, whether the claimant had a severe impairment; (3) if so, whether the impairment (or combination of impairments) met or equaled a listed impairment; (4) if not, whether the impairment (or combination of impairments) prevented the claimant from performing past relevant work[3]; and (5) if so, whether the impairment (or combination of impairments) prevented the claimant from performing any other jobs available in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(a)-(g).

The ALJ found that Ms. Bearden had not engaged in substantial gainful activity since her alleged disability onset date and that her cardiomyopathy secondary to alcohol abuse, coronary artery disease, and alcohol abuse were severe impairments. (Tr. 14-15, 25) The ALJ also found that Ms. Bearden did not have an impairment or combination of impairments that met or equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1526, 416.926). (Tr. 14, 25)

Ms. Bearden's main impairment appears to be alcohol abuse, according to the ALJ. He found, however, that her use of alcohol was not beyond her control and did not preclude her from obtaining and maintaining employment. (Tr. 24)

---

[3] If the claimant has sufficient residual functional capacity to perform past relevant work, the inquiry ends and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

The ALJ determined that Ms. Bearden retained the residual functional capacity ("RFC") to perform a full range of sedentary work. (Tr. 19, 23, 25) Relying on vocational expert testimony, the ALJ concluded that Ms. Bearden could perform her past relevant work as an administrative assistant. (Tr. 25-26) Accordingly, the ALJ concluded Ms. Bearden was not disabled within the meaning of the Act. (Tr. 26)

### III. <u>Analysis</u>:

    A.     *Standard of Review*

In reviewing the Commissioner's decision, this Court must determine whether there is substantial evidence in the record as a whole to support the decision. *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011); 42 U.S.C. § 405(g). Substantial evidence is something less than a preponderance, but it must be, "sufficient for reasonable minds to find it adequate to support the decision." *Boettcher*, 652 F.3d at 863 (citing *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005)).

In reviewing the record as a whole, the Court must consider both evidence that detracts from the Commissioner's decision and evidence that supports the decision; but, the decision cannot be reversed, "simply because some evidence may support the opposite conclusion." *Id*. (citing *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006)).

B.   *Listing 12.04*

Ms. Bearden complains the ALJ failed to properly evaluate whether she met Listing 12.04 for affective disorders. She claims she meets parts A(1) and B of Listing 12.04. In order to establish that she met Listing 12.04(A)(1) for depressive syndrome, she had to prove, by medically documented persistence either continuous or intermittent, at least four of the following:

a. Anhedonia or pervasive loss of interest in almost all activities; or

b. Appetite disturbance with change in weight; or

c. Sleep disturbance; or

d. Psychomotor agitation or retardation; or

e. Decreased energy; or

f. Feelings of guilt or worthlessness; or

g. Difficulty concentrating or thinking; or

h. Thoughts of suicide; or

i. Hallucinations, delusions or paranoid thinking;

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(A)(1). Ms. Bearden claims that she experienced seven of the ten criteria in section 12.04(A)(1). To support this proposition, she relies on two Psychiatric/Psychological Impairment Questionnaires completed by Joe F. Bradley, M.D., a psychiatrist who treated Ms. Bearden. In the questionnaire

responses, Dr. Bradley checked boxes indicating he had identified "positive clinical findings" for these criteria in Ms. Bearden. (Tr. 418, 476)

Ms. Bearden's reliance on Dr. Bradley's questionnaires, however, is misplaced. The regulation requires medical documentation of persistence. The records from Dr. Bradley's treatment of Ms. Bearden did not support a finding of medically documented persistence. And Dr. Bradley did not identify any laboratory or diagnostic test results that support his opinion. As discussed below, Dr. Bradley's opinions were not supported by objective medical evidence.

Additionally, under 20 C.F.R. Pt. 404, subpart P, Ms. Bearden also had to meet either the paragraph B or paragraph C criteria. Ms. Bearden claims she met the criteria set forth in paragraph B, which provides that her depressive syndrome resulted in at least two of the following:

    1. Marked restriction of activities of daily living; or

    2. Marked difficulties in maintaining social functioning; or

    3. Marked difficulties in maintaining concentration, persistence, or pace; or

    4. Repeated episodes of decompensation, each of extended duration;

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(B). Again, Ms. Bearden primarily relies on the unsupported opinions of Dr. Bradley to establish that she had marked difficulties in maintaining social functioning and maintaining concentration, persistence and pace.

There is substantial evidence in the record, however, to support the ALJ's conclusion that Ms. Bearden did not meet the paragraph B criteria. (Tr. 22-23)

In his April 21, 2008 questionnaire responses, Dr. Bradley found that Ms. Bearden was only mildly limited in her ability to interact appropriately with the general public; to ask simple questions; to maintain socially appropriate behavior; and to adhere to basic standards of neatness and cleanliness. (Tr. 421) Dr. Bradley also found her only moderately limited in her ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (Tr. 421) The only category relating to social interactions in which Dr. Bradley found Ms. Bearden to be markedly limited in the 2008 questionnaire he completed was in her ability to accept instructions and respond appropriately to criticism from supervisors. (Tr. 421)

Ms. Bearden relies on Dr. Bradley to establish that she experienced episodes of decompensation.[4] Even though Dr. Bradley checked a box indicating Ms. Bearden had experienced episodes of decompensation, there is no credible evidence in the record to support this assertion. Moreover, Ms. Bearden points to nothing in the record indicating

---

[4] Episodes of decompensation can be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (*e.g.*, hospitalizations, placement in a halfway house, or a highly structured and directing household). The term repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every four months, each lasting for at least two weeks. 20 CFR Pt. 404, Subpt. P, App. 1, § 12.00(C)(4).

she experienced *repeated* episodes of decompensation, each of *extended duration,* as required by the regulation to satisfy paragraph B  See 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04(B), 12.00(C)(4) (emphasis added).

Sam Boyd, Ph.D., completed a "Mental Diagnostic Evaluation" of Ms. Bearden on April 9, 2007.  (Tr. 358)  On examination, Ms. Bearden reported that her symptoms of depression began at age 20, but had worsened in the last 12 years.  (Tr. 357-58)  She reported that Dr. Bradley had prescribed Effexor and Xanax for her.  (Tr. 358)  She stated her medications were effective and that she did not experience side effects from taking them.  (Tr. 358)

When asked about her work history, Ms. Bearden told Dr. Boyd that she had quit her job because a new manager was hired and began changing office procedures.[5]  (Tr. 359)  Dr. Boyd assessed Ms. Bearden as having an IQ of 71 or higher.  (Tr. 360)  Ms. Bearden reported to Dr. Boyd that her depression, by itself, did not prevent her from working.  (Tr. 360)

Dr. Boyd diagnosed Ms. Bearden with Dysthymic Disorder and Alcohol Abuse.  (Tr. 361)   He noted that she took care of her own hygiene and grooming; did household chores; was able to drive; had a boyfriend; socialized with her mother and sister; and was

---

[5]Ms. Bearden also reported to Nancy J. Toombs, M.D. that she quit working because of the new manager during a February 15, 2007, consultative examination.  Dr. Toombs's examination  of Ms. Bearden was cut short, however, because Ms. Bearden was heavily intoxicated when she arrived.  (Tr. 313)

able to communicate with the examiner in an effective and intelligible manner. Dr. Boyd concluded "that her depression, by itself, would not prevent her from having the capacity to cope with the demands of basic work-like tasks. She should be able to sustain the attention, concentration, and persistence required of basic work-like tasks." (Tr. 361

On April 12, 2007, Jay Rankin, M.D., a state agency physician, reviewed Ms. Bearden's case. He concluded that Ms. Bearden's affective disorder and substance addiction disorder caused mild restriction on her activities of daily living; moderate difficulties maintaining social function; and moderate difficulties maintaining concentration, persistence, and pace. He noted that Ms. Bearden had not had any episodes of decompensation. (Tr. 381, 383) In the Psychiatric Review Technique form he completed April 17, 2007, Dr. Rankin concluded that Ms. Bearden had mild-to-moderate limitations, but was capable of semiskilled work. (Tr. 397) Dr. Rankin's conclusions were affirmed on reconsideration by Brad Williams, Ph.D., on July 16, 2007. (Tr. 456)

There is substantial evidence in the record to support the ALJ's conclusion that Ms. Bearden did not meet Listing 12.04.

    C.    *Treating Physician Rule*

Ms. Bearden claims that the ALJ failed to follow the treating physician rule when he rejected the opinions of Dr. Bradley and Stephen Snyder, M.D., an internist. The ALJ may reject the opinion of any medical expert if that opinion is inconsistent with the

medical record as a whole. *Martise v. Astrue*, 641 F.3d at 909, 926 (8th Cir. 2011) (treating physician's opinion properly discounted when inconsistent with treatment notes or with medical evidence as a whole). And it is the ALJ's function to resolve conflicts among the various treating and examining physicians. *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007)(quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)). A treating physician's opinion that a claimant is disabled or cannot be gainfully employed gets no deference, because it invades the province of the Commissioner, whose job it is to make the ultimate disability determination. *House v. Astrue*, 500 F.3d 741, 745 (8th Cir. 2007).

    1.    Dr. Bradley

Ms. Bearden claims that the treatment records from Dr. Bradley establish that she had marked difficulties in maintaining social functioning and maintaining concentration, persistence, and pace. The records from Ms. Bearden's treatment with Dr. Bradley, however, do not support this conclusion.

The medical records indicate that Dr. Bradley treated Ms. Bearden in April, 2004. Dr. Bradley noted she was grieving the loss of her husband, and he diagnosed depression. He prescribed Effexor and Xanax. (Tr. 271) In September, 2004, he wrote that Ms. Bearden reported ongoing problems, such as what to do about the Harley Davidson she had purchased with her husband, and she was having some initial difficulties with her

adjustment back to work.  (Tr. 271)  He noted Ms. Bearden had increased stress and grief and was drinking four or five beers per night.

In October, 2004, Dr. Bradley noted that Ms. Bearden had cut back on her drinking.  She was doing well on her medications and was improving at dealing with her grief.  (Tr. 270)

According to evidence in the record, Ms. Bearden did not return to Dr. Bradley again until almost two years later, on September 28, 2006.  At that time, Ms. Bearden reported that she had completed an alcohol rehabilitation program at Wilbur Mills in April of 2006.  Dr. Bradley noted that Ms. Bearden's depression was worse.  In spite of that, he continued her on the same medications.  (Tr. 269)  Notes from Ms. Bearden's visit to Dr. Bradley on February 13, 2007, indicate that she was doing better on her medications.  (Tr. 311)

The treatment records from October, 2004, to February, 2007, were the only records from Dr. Bradley that were part of the transcript before the ALJ at the hearing in September, 2008, and Ms. Bearden's attorney did not indicate to the ALJ that there was additional medical evidence from Dr. Bradley to be added to the record.  Ms. Bearden's lawyer did submit additional medical records from Dr. Bradley to the Appeals Council. (Tr. 1-5)

The additional records submitted and considered by the Appeals Council reveal that Ms. Bearden also saw Dr. Bradley in May, 2007.  At that visit, she described

11

problems with her living arrangements and with friends and relatives. He noted that Ms. Bearden had alcohol on her breath. Dr. Bradley concluded her depression was worse, and he diagnosed her with major depression. He prescribed Effexor and Alprazolam (Tr. 500)

The records indicate that Ms. Bearden did not return to Dr. Bradley for treatment again until almost a year later, on April 21, 2008. Dr. Bradley's notes from that visit indicate a diagnosis of "Depression, N.O.S." He prescribed Lexapro, Citalopram, and Alprazolam. (Tr. 499) Notes from a visit the following month indicate that Ms. Bearden was having a "good response" to her medications. Dr. Bradley prescribed Cymbalta. (Tr. 498)

Two months later, in of July 2008, Ms. Bearden was noted to be very tearful and depressed. (Tr. 497) She reported having a hard time not drinking. She also reported getting her "gun out," but giving it to her son. Dr. Bradley again diagnosed major depression. He prescribed Cymbalta, Alprazolam, Clonazopam, and Campral.[6] (Tr. 497)

Three months later, in October of 2008, Ms. Bearden stated that she had been off alcohol for over a week. Dr. Bearden diagnosed major depression and alcohol dependence, and prescribed Citalopram, Campral, and Alprazolam.

In April of 2009, Ms. Bearden reported that she had married, but was having problems with her step-daughter. She reported having completed alcohol rehabilitation

---

[6] Campral is indicated for the maintenance of abstinence from alcohol in patients with alcohol dependence who are abstinent at treatment initiation. *Physician's Desk Reference* 3060-0135 (64th ed. 2010).

and being "clean and sober." (Tr. 495) During a visit to Dr. Bradley in August of 2009, however, Ms. Bearden reported that she was not drinking, but then admitted that she was drinking only 10-12 beers per week, down from a "30-pack per day, at times." (Tr. 494)

Except for a notation in September, 2004, indicating Ms. Bearden was experiencing difficulties adjusting to being back at work, there is no other reference in Dr. Bradley's treatment records indicating that Ms. Bearden had particular difficulties with concentration, persistence or pace, or with social functioning.

In questionnaires completed at the request of Ms. Bearden's counsel, in April, 2008, and June, 2009, Dr. Bradley stated that he had diagnosed Ms. Bearden with depressive disorder, not otherwise specified, and alcohol abuse secondary to depression. He did not reference any laboratory or diagnostic test to support his diagnosis. (Tr. 417-18) He stated that Ms. Bearden's prognosis was fair. (Tr. 417)

Dr. Bradley checked boxes indicating that Ms. Bearden was markedly limited in her ability to: remember locations and work-like procedures; understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration; perform activities within a schedule; work in coordination or proximity to others without being distracted by them; complete normal workweek without interruption; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to changes in the work setting; travel to unfamiliar places or use public transportation; set realistic goals or make plans independently. (Tr. 420-22)

The ALJ referred to Dr. Bradley's April 2008 questionnaire and discussed the July 29, 2008 letter addressed "To Whom it May Concern," where Dr. Bradley wrote that Ms. Bearden had experienced at least one previous psychiatric hospitalization in November of 1997.  But there is no evidence of the noted hospitalization in this record.  The ALJ rejected Dr. Bradley's assessment form because it was internally inconsistent and noted that, despite finding her markedly limited in several categories, Dr. Bradley indicated that Ms. Bearden's prognosis was fair, and that she was capable of low-stress work and could possibly function with no time limitations or close supervision.  (Tr. 21, 423)

Additionally, the ALJ noted that Dr. Bradley's opinion was inconsistent with the opinion of Dr. Boyd, who found that Ms. Bearden's depression, by itself, would not prevent her from coping with the demands of basic work.  (Tr. 22, 361)  The ALJ also pointed out that Arthur Schmidt, M.D., testified at the hearing that Ms. Bearden's depression would not prevent her from working.  (Tr. 22, 56)

As noted, there are no progress notes from Dr. Bradley to support his conclusion that Ms. Bearden was markedly limited in concentration, persistence, and pace or social functioning.  Instead, the evidence indicates Ms. Bearden was doing well on her medications and frequently engaged in social activities, including dating, going to church, and attending Alcoholics Anonymous meetings.  (Tr. 494-95, 498, 500)

There is substantial evidence to support the ALJ's decision not to give Dr. Bradley's opinion great weight.

2.      Stephen D. Snyder, M.D.

The ALJ also evaluated Dr. Snyder's opinions. (Tr. 16-18) The only records from Dr. Snyder are an April 14, 2008 "Multiple Impairment Questionnaire," an April 18, 2008 letter, and an August 6, 2008 letter. (Tr. 415, 463-70, 473)

In his April 18, 2008, letter addressed "To Whom It May Concern," Dr. Snyder stated that Ms. Bearden was "totally disabled without consideration of any past or present drug and/or alcohol use. Drug and/or alcohol use is not a material cause of this individual's disability." (Tr. 415) In his August 6, 2008 letter, also addressed "To Whom It May Concern," Dr. Snyder stated that Ms. Bearden "became disabled" in April or May of 2005, after being hospitalized for "acute decompensate cardiomyopathy, coronary artery disease and alcoholism." He also noted that Ms. Bearden had been hospitalized for seizures and delirium related to alcoholism. He stated that he only saw Ms. Bearden "sporadically," and that she only saw her heart doctor "sporadically." He concluded that Ms. Bearden suffered from anxiety and depression, was incapable of being gainfully employed, and should be deemed disabled. (Tr. 473)

In the April, 14, 2008 Multiple Impairment Questionnaire, Dr. Snyder diagnosed Ms. Bearden with alcoholism with seizures, memory loss, and dysthymic disorder. (Tr. 463-70) He stated that Ms. Bearden's prognosis was guarded. He also noted that Ms. Bearden had permanent organic damage from chronic alcoholism and was "likely to die"

15

if she resumed abusing alcohol. (Tr. 463)  He found she could sit two hours, stand or walk for one hour, and was incapable of even a low-stress job.  (Tr. 468)

The ALJ rejected Dr. Snyder's opinion because he found it to be highly inconsistent with the objective medical evidence and other evidence in the record.   (Tr. 17)  He noted that a finding by a treating physician that a patient is disabled, does not necessarily mean that the person meets the disability requirements set out in the Act.  He also noted that Dr. Snyder had apparently taken Ms. Bearden's subjective allegations at face value.  (Tr. 17)  As the Commissioner notes in his brief, it is difficult to know what the bases for Dr. Snyder's opinions were, because the transcript does not contain any treatment records from Dr. Snyder.

In his opinion, the ALJ points out that Dr. Snyder's opinion was contrary to the opinion of the Dr. Schmidt.  (Tr. 18)  Dr. Schmidt reviewed Ms. Bearden's medical records, and testified at the hearing that he could not find any evidence indicating Ms. Bearden could not do at least sedentary work.  (Tr. 17, 56)

In a letter to Ms. Bearden's attorney dated May 1, 2007, William Rollefson, M.D., Ms. Bearden's cardiologist, stated that he believed her cardiomyopathy was at least partly explained by her heavy alcohol history.  (Tr. 404)  Dr. Rollefson noted that the only way to determine whether it was alcoholic cardiomyopahy was for Ms. Bearden to stop abusing alcohol.  He notes that she had not done that.  (Tr. 404)

The ALJ also notes that Dr. Snyder's opinion was also contrary to the opinions of the State Agency physicians who found that Ms. Bearden could perform a full range of sedentary work. (Tr. 18, 302, 459)

The ALJ appropriately considered and analyzed Dr. Snyder's opinion in light of all of the evidence in the record, and there is substantial evidence to support his decision not to give Dr. Snyder's opinion great weight.

D. *Consideration of All Impairments*

Ms. Bearden claims that the ALJ failed to consider all of her impairments. Specifically, she claims the ALJ failed to give meaningful consideration to her knee impairments and seizures. (#14 at pp. 21-22) She again looks to Dr. Snyder and Dr. Bradley's questionnaire responses to support her claim. As explained, however, the opinions of Dr. Bradley (a psychiatrist who did not treat Ms. Bearden's knee) and Dr. Snyder (whose findings are unsupported by any objective medical evidence in the record) are not entitled to much weight.

Ms. Bearden's testimony is the only real evidence of any problem with her right knee. She claims that Dr. Snyder's questionnaire responses, as well as records from Conway Regional Medical Center, indicate she had "numerous syncope/seizure events." (Tr. 22) As the ALJ notes, however, the records from Ms. Bearden's emergency room visit to Conway Regional on February 2, 2007, indicated a "possible" seizure. Notably, however, Ms. Bearden's problem occurred after she had been drinking alcohol without

having eaten.  Results from a CT scan of her brain were negative and the final diagnosis was a syncopal episode secondary to hypoglycemia.  (Tr. 318, 320)  She was urged to stop drinking alcohol.  (Tr. 318)

On February 16, 2007, Ms. Bearden was again taken to Conway Regional with reports that she was unresponsive and foaming at the mouth.  She reported having experienced multiple "syncopal" episodes in the past, secondary to hypoglycemia.  (Tr. 330)  While a "possible seizure" was noted in the records, a CT scan of her head was negative.[7]  (Tr. 333)

Finally, Ms. Bearden suggests that the ALJ should have contacted her treating physician to clarify her medical conditions or to obtain missing records.  Once an ALJ concludes, based on sufficient evidence, that a treating doctor's opinion is inherently contradictory or unreliable, it is not necessary for the ALJ to seek additional information from that doctor.  See *Samons v. Astrue*, 497 F.3d 813, 819 (8th Cir. 2007) (citing *Hacker v. Barnhart*, 459 F.3d 934, 938 (8th Cir. 2006)).  As noted, here the ALJ's decision not to give great weight to the opinions of Drs. Bradley and Snyder is supported by substantial evidence.  Consequently, the ALJ did not have a duty to contact them.

---

[7]The records indicate that there was discussion about transferring Ms. Bearden to Baptist Hospital.  However, there is not any documentation of her treatment at Baptist Hospital in the record.

E.   *Residual Functional Capacity*

Ms. Bearden argues that the ALJ improperly evaluated her residual functional capacity. She claims the ALJ failed to do a "function-by-function" analysis and instead "abdicated this duty to Dr. Schmidt," the Medical Expert who testified at the hearing. Ms. Bearden's argument is not well taken.

In fact, the ALJ did perform a function-by-function analysis, based on all of the evidence in the record. (Tr. 19-23) He concluded that Ms. Bearden had the residual functional capacity to perform work that involved lifting and carrying 10 pounds occasionally and less than 10 pounds frequently; standing/walking no more than two hours in an 8-hour day; sitting no more than six hours in an 8-hour day. (Tr. 19) He also found that she retained the ability to remember and carry out detailed job instructions, to make judgments in work related situations, and to respond appropriately to co-workers, supervisors, and minor changes in work routine. (Tr. 19)

As part of his analysis, the ALJ considered not only the testimony of the medical expert, but also the records from her treating psychiatrist, her treating internist, and her treating cardiologist. (Tr. 14-17) Additionally, he considered Ms. Bearden's testimony, as well as the testimony of her friend. (Tr. 18-19)

Ms. Bearden complains that the ALJ should have given more weight to the opinions of Dr. Bradley and Dr. Snyder. But, as noted, the ALJ offered legitimate

explanations for not giving these opinions great weight.  There is substantial evidence in the record to support the ALJ's residual functional capacity determination.

    F.    *Medical Vocational Guidelines*

Finally, Mrs. Bearden argues that, in her case, the Medical Vocation Guidelines directed a finding of "disabled."  This argument assumes that the ALJ should have found that Ms. Bearden had the residual functional capacity for only unskilled work and continued to step five of the analysis.  There is substantial evidence supporting the ALJ's residual functional capacity analysis.  Consequently, it was appropriate for the ALJ to use the testimony of a vocational expert to determine, at step four, that Ms. Bearden was capable of returning to her past relevant work.  Having made that finding at step four, it was not necessary for the ALJ to continue to step five, where the Medical Vocation Guidelines would be applicable.

## IV.   Conclusion:

There is sufficient evidence in the record as a whole to support the Commissioner's determination that Annella Jeanette Bearden was not disabled within the meaning of the Act.  Accordingly, her appeal is DENIED, and the Clerk is directed to close the case, this 6th day of April, 2012.

_____
UNITED STATES MAGISTRATE JUDGE